# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| SUPREME HOME HEALTH SERVICES, INC. AND EMILY WINSTON, PRESIDENT | * | CIVIL ACTION NO.  18-1370 |
| VERSUS | * | JUDGE TERRY A. DOUGHTY |
| ALEX M. AZAR, II, SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL. | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned magistrate judge, on reference from the District Court, are two motions:  1) a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted [doc. # 26] filed by defendants, Alex M. Azar, II, Secretary of the U.S. Department of Health and Human Services, and Seema Verma, Administrator for the Centers for Medicare & Medicaid Services; and 2) a motion to dismiss [doc. # 28] filed by defendant, Palmetto, GBA, L.L.C. for improper service pursuant to Rules 12(b)(2), (5), and 4(m), or alternatively, to dismiss for failure to state a claim upon which relief can be granted, including the claims of plaintiff, Emily Winston, for lack of standing.  For reasons assigned below, it is recommended that Azar and Verma's motion be GRANTED-IN-PART and DENIED-IN-PART, and that Palmetto's motion be DENIED, as moot.

## Background

Supreme Home Health Services, Inc. ("Supreme") is a home health agency located in Monroe, Louisiana.  Supreme has been in business for thirty-eight years and employs 99 people

who provide skilled nursing care, physical therapy, occupational therapy, speech therapy, nursing home health aid, medical social work, and other medical social services to patients in their homes, assisted living facilities, and retirement communities.  Of the approximately 175 patients served in eight parishes, between 76 and 86% are covered under the Medicare Program.

Supreme enrolled in the Medicare Program in 1983, and has remained so enrolled.[1] Under the Medicare Act, no payment may be made for items or services, "which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . ."  *See* 42 U.S.C. § 1395y.  Unlike private insurance plans, Medicare pays most claims first and audits only some claims *after* payment.  The Secretary of Health and Human Services ("Secretary") has a statutory, regulatory, and quasi-contractual duty to recoup payments for non-covered services.  *See* 42 U.S.C. § 1395g(a) (Secretary shall determine amount due "with necessary adjustments on account of previously made overpayments."); 42 C.F.R. § 405.373(A).

Upon enrollment, Supreme, through Winston, expressly agreed "to return any moneys incorrectly collected from any person or to dispose of overpayments as specified in Regulations."  [doc. # 27-10, Exh. J].  Again, in February 2012, Supreme, through Winston, agreed "to abide by the Medicare laws, regulations and program instructions that apply to this Provider" and that the "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions. . ." [doc. # 27-6, Exh. F, at pgs. 2-3].  Winston further certified that, "I agree that any existing or

---

[1]  The Medicare Program provides healthcare coverage for more than 56 million elderly and disabled beneficiaries.  *See* 42 U.S.C. § 1395, *et seq*.

future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments." *Id.* Finally, Winston signed the official document and attested, "[m]y signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program." *Id.*

In an October 17, 2012 letter, AdvanceMed, a Zone Program Integrity Contractor ("ZPIC") notified Supreme that a post-payment audit of some 318 claims had revealed that Supreme had submitted Medicare claims in the amount of $1,739,569.00 for non-covered services. AdvanceMed found that some of the care provided was not reasonable and necessary based on the medical documentation submitted. AdvanceMed then used statistical sampling to extrapolate an overpayment from all codes billed by Supreme from January 1, 2009, through July 31, 2011. [doc. # 1-8 at pg. 10].

In an October 23, 2012 letter, Palmetto GBA, LLC ("Palmetto"), the Medicare Administrative Contractor ("MAC"), requested that Supreme repay the overpayment amount immediately or face recoupment. [doc. # 1-9 at pgs. 1-2]. Palmetto also notified Supreme that recoupment could be stopped during the first two levels of the administrative appeal process and resumed after completion of the second level. [doc. # 1-9 at pg. 3].

In November 2012, Supreme requested a redetermination decision from Palmetto at the first level of the administrative process. [doc. #s 1-1 at pgs. 10-11 and 1-13, at pg. 1]. The redetermination request stayed recoupment.

On January 31, 2013, Palmetto issued an unfavorable decision.

In March 2013, Supreme appealed the redetermination decision to the second level of the administrative process by requesting reconsideration by a Qualified Independent Contractor

("QIC"), which again caused recoupment to be stayed.

On February 4, 2014, the QIC issued a "partially favorable" decision.  [doc. # 1-6, at pg. 1].  Thereafter, Supreme submitted additional evidence, and QIC found good cause to reopen and reprocess the appeal.

On May 8, 2015, the QIC issued a reconsideration decision in which it went through each denied claim by reviewing the medical documentation that Supreme had provided in support of medical necessity.  [doc. # 27-2].  The QIC's decision was "partially favorable," finding that many of Supreme's claims were only partially covered by Medicare.  *Id.* at 1.  As a result, the overpayment determination was reduced by $20,741.27 to $1,718,827.73.  [doc. # 1-6 at 1; *see* doc. 1-1 at 11].

On July 10, 2015, Supreme appealed the reconsideration decision to the third level of the administrative review process by requesting a hearing before an Administrative Law Judge ("ALJ").  [doc. # 1-14 at pg. 1].

On June 1, 2016, Palmetto sent Supreme an overpayment demand letter, advising that payments totaling $2,357,657.83 (principal of $1,718,827.73, plus interest of $638,830.10) were due by July 1, 2016, and that, absent payment, Palmetto could begin recouping the overpayment after the lapse of 30 days.  [doc. # 1-6 at pgs. 1-2].  On July 17, 2016, Supreme requested a five-year (60-month) extended repayment schedule – the longest term permitted by statute – which CMS (Centers for Medicare and Medicaid Services) ultimately approved.  [doc. #s 27-3, Exh. C, at pg. 2, 1-10 at pgs. 1-3].  Under the terms of the schedule, Supreme was required to make monthly payments from October 2016 through September 2021.  [doc. # 1-10 at pgs. 1-3].  The initial payments (from October 2016 through September 2017) were in the amount of

4

$69,337.83.  *Id.*  The remaining monthly payments from October 2017 through the end of the schedule declined to $43,904.11.  *Id.*

On January 24, 2018, CMS approved a revised extended repayment schedule that lowered Supreme's payments to $30,000 through January 2019.  [doc. # 27-4, Exh. D, at pgs. 1-3].  Under this schedule, the payment amounts are expected to rise by increments of $10,000 every six months, maxing out at $80,000 in February 2021.  *Id.*[2]  As of November 13, 2018, CMS has recouped $7,353.12 from Supreme of the $1,739,569.00 overpayment, plus $817,194.31 in interest.  (Decl. of Joseph Strickland; [doc. # 27-11, Exh. K]).

Meanwhile, on October 19, 2018, Supreme and Winston (collectively, "Supreme") filed the instant complaint for a TRO and preliminary injunction against Alex M. Azar, II, in his official capacity as the Secretary of HHS; Seema Verma, in her official capacity as the Administrator for CMS; and Palmetto – the Medicare Administrative Contractor ("MAC").  The complaint seek an injunction "to prevent Defendants from recouping approximately $1,700,000.00 in alleged overpayment and $653,725.47 in interest . . . from Supreme – which would bankrupt Supreme and cause it to go out of business— before Plaintiffs have the opportunity to be heard by the . . . ALJ."  [doc. # 1, pgs. 1-2].

Supreme further asserted that recoupment violated its due process rights while a "backlog of hundreds of thousands of claims [are] pending before the HHS Office of Medicare Hearings and Appeals will irreparably harm Plaintiffs through the destruction of their business and the ensuing certain closure of its operations."  *Id.* at pg. 2.  In addition, Supreme alleged that the

---

[2]  There is no indication that Supreme requested reconsideration or further revision to the extended repayment schedule.

extraordinary delays violated the plain terms of the statute.  *Id.* at pg. 2, ¶ 8.  Ultimately, the suit specifies four counts:  1) procedural due process; 2) substantive due process; 3) ultra vires; and 4) preservation of rights under § 704 of the Administrative Procedure Act ("APA").[3]

On February 15, 2019, defendants filed two motions to dismiss.  Azar and Verma joined in one motion and petitioned for dismissal of the entire suit for lack of subject matter jurisdiction, or alternatively, for failure to state a claim upon which relief can be granted.  Whereas, Palmetto filed the second motion to dismiss on the grounds that it was not properly served, Emily Winston lacked standing to sue for alleged injuries sustained by Supreme, and because the complaint failed to state a claim for relief against Palmetto.  By standing order, the District Court referred the motions to dismiss to the undersigned for report and recommendation.

Supreme filed its oppositions to the motions to dismiss on March 1, 2019.  [doc. #s 32-33].  Palmetto filed its reply brief on March 8, 2019.  [doc. # 34].  Azar and Verma did not file a reply, and the time to do so has lapsed.  *See* Notice of Motion Setting [doc. # 29].  Thus, the matter is ripe.

## Law and Analysis

### I.    Subject Matter Jurisdiction

The United States, as sovereign, is immune from suit except in the manner and degree sovereign immunity is waived.  *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948 (1976).  The so-called doctrine of sovereign immunity renders "the United States, its departments, and its employees in their official capacities as agents of the United States immune from suit except as

---

[3]  Contemporaneous with their complaint, Supreme also filed a motion for TRO and preliminary injunction. [doc. # 1-2].  The District Court denied the TRO, but the motion for preliminary injunction remains pending.  (April 1, 2019, Order [doc. # 36]).

the United States has consented to be sued." *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 373 (5th Cir.1987) (citations omitted).[4]  In the absence of an express congressional waiver of immunity, an action against the United States or its agencies does not fall within the judicial power of the federal courts.  *See Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459 (1962).  In other words, the court lacks subject matter jurisdiction to entertain the suit.  *See United States v. Sherwood*, 312 U.S. 584, 587, 61 S.Ct. 767, 770 (1941).

Before proceeding further, the court pauses to observe that Congress authorized the HHS Secretary to enter into contracts with any eligible entity to serve as a medicare administrative contractor ("MAC").  42 U.S.C. § 1395kk-1(a)(1).  Palmetto is a MAC.  (Compl., ¶ 34).  However, Medicare fiscal intermediaries, such as Palmetto, act as agents of the HHS Secretary. *Peterson v. Weinberger*, 508 F.2d 45, 51–52 (5th Cir.1975).  Palmetto, which was acting within the scope of its official duties, is entitled to the same official immunity as officers or employees of the United States.  *Marsaw v. Thompson*, 133 Fed. Appx. 946, 949 (5th Cir.2005). Therefore, the real party in interest in this suit is the United States.  *Peterson, supra.*

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted).  The party seeking to invoke jurisdiction bears the burden of demonstrating its existence.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).  The court can resolve a motion to dismiss for lack of subject matter jurisdiction

---

[4]  An official capacity suit against the head of a federal department is a suit against the sovereign, i.e., the United States.  *Unimex, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 594 F.2d 1060, 1061 (5th Cir.1979)

"based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Enable Mississippi River Transmission, L.L.C. v. Nadel & Gussman, L.L.C.*, 844 F.3d 495, 497 (5th Cir.2016) (citations and internal quotation marks omitted).

Supreme alleged that the court enjoys jurisdiction pursuant to the federal question statute, 28 U.S.C. § 1331, the mandamus statute, 28 U.S.C. § 1361; the All Writs Act, 28 U.S.C. § 1651; the Social Security Act, 42 U.S.C. § 405(g), as extended to Medicare, 42 U.S.C. § 1395ii; and the Administrative Procedures Act, 5 U.S.C. § 705.5. (Compl., ¶ 19). However, "[t]he Medicare Act severely restricts the authority of federal courts by requiring 'virtually all legal attacks' under the Act be brought through the agency." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 653 (5th Cir.2012) (citation omitted).

The third sentence of 42 U.S.C. § 405(h) declares that § 405(g) is the sole avenue for judicial review for all "claim[s] arising under" the Medicare Act, even to the exclusion of 28 U.S.C. § 1331. *Heckler v. Ringer*, 466 U.S. 602, 614–15, 104 S.Ct. 2013, 2021 (1984) (citation omitted). Therefore, if the suit "arises under" the Medicare Act, 42 U.S.C. § 1395 et seq., federal courts may not exercise general federal question jurisdiction under 28 U.S.C. § 1331. *Faith Home Health Servs. Inc. v. Shalala*, 166 F.3d 341 (5th Cir.1998) (citation omitted).

The "claim arising under" language is to be construed quite broadly to include any claims in which "both the standing and the substantive basis for the presentation" of the claims is the Medicare/Social Security Act. *Ringer, supra* (citing *Weinberger v. Salfi*, 422 U.S. 749, 760, 95 S.Ct. 2457, 2464, (1975)). Here, there is little question that Supreme (including Winston's)

claims arise under the Medicare Act.  It makes no difference if, like here, plaintiffs seek only injunctive or declarative relief.  *Ringer, supra*.

Judicial review for claims "arising under" the Medicare Act normally becomes available only after a party first presents the claim to the Secretary *and* receives a final decision. *Physician Hosps. of Am.*, 691 F.3d at 653.  In other words,

> jurisdiction under section 405(g) is determined under a two prong test.  First, there must have been a presentment to the Secretary . . . This element can never be waived and no decision of any type can be rendered if this requirement is not satisfied. . . . Second, the claimant must have exhausted his administrative review.

*Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir.1999) (citing *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893 (1976)).

The government's protestations notwithstanding, the court readily finds that Supreme presented its claim to the Secretary, if not by initiating the administrative appeals process, then by requesting review before an ALJ.  *See* discussion, *infra*.[5]

As to § 405(g)'s exhaustion prong, a provider like Supreme "may come to district court only after either (1) satisfying all four stages of administrative appeal, i.e., after the [Medicare Appeals] Council has rendered a decision, or (2) after the provider has escalated the claim to the [Medicare Appeals] Council and the Council acts or fails to act within 180 days."  *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 501 (5th Cir.2018) (citations omitted).[6]

_____

[5]  However, there is no indication that Winston presented her claim to the Secretary.  Indeed, jurisdiction under § 405(g) is limited to an individual who was a *party* to a hearing before the Secretary.  Because presentment is mandatory, the court lacks jurisdiction to entertain Winston's claim.

[6]  The Fifth Circuit explained the four-step administrative appeals process available to Medicare providers as follows:

> First, [a provider] may submit to the [Medicare Administrative Contractor] a claim for redetermination of the overpayment.  Second, it may ask for reconsideration from a Qualified Independent Contractor. . . hired by [HHS's

Here, Supreme acknowledged that it did not exhaust the administrative process.

Therefore, it must establish that it meets an exception to exhaustion. The courts have recognized

three narrow exceptions to excuse the foregoing administrative exhaustion requirement: "(1) the

*Eldridge* collateral-claim exception under § 405(g); (2) the preclusion-of-judicial-review

exception under 28 U.S.C. § 1331; and (3) mandamus jurisdiction under 28 U.S.C. § 1361."

*Adams, supra* (citing *Family Rehab.*, 886 F.3d at 501; *Mathews v. Eldridge*, 424 U.S. 319,

330–31 (1976); *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19, 120 S.Ct.

1084, 1097 (2000); and *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 764 (5th Cir.

2011). The court will address each in turn.

    a)    <u>The Collateral Claim Exception</u>

---

Centers for Medicare and Medicare Services] for that purpose. If the [Qualified Independent Contractor] affirms the [Medicare Administrative Contractor's] determination, the [Medicare Administrative Contractor] may begin recouping the overpayment by garnishing future reimbursements otherwise due the provider.

Third, the provider may request de novo review before an [administrative law judge] within the Office of Medicare Hearings and Appeals[,] an agency independent of [the Centers for Medicare and Medicaid Services]. The [administrative-law-judge] stage presents the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact. The [administrative law judge] "shall conduct and conclude a hearing . . . and render a decision . . . not later than" 90 days after a timely request. Fourth, the provider may appeal to the Medicare Appeals Council[,] an organization independent of both [the Centers for Medicare and Medicaid Services] and [the Office of Medicare Hearings and Appeals]. The [Medicare Appeals] Council reviews the [administrative law judge's] decision de novo and is similarly required to issue a final decision within 90 days. Furthermore, if the [administrative law judge] fails to issue a decision within 90 days, the provider may "escalate" the appeal to the [Medicare Appeals] Council, which will review the [Qualified Independent Contractor's] reconsideration.

*Adams EMS, Inc. v. Azar*, No. 18-1443, 2018 WL 5264244, at *1–2 (S.D. Tex. Oct. 23, 2018) (quoting *Family Rehab.*, 886 F.3d at 499–500 (footnotes and citations omitted)).

The *Eldridge* collateral claim exception to the administrative exhaustion requirement has two requirements:  1) the claims must be "entirety collateral" to a substantive agency decision; and 2) for which "full relief cannot be obtained at a postdeprivation hearing."  *Family Rehab*, 886 F.3d at 501.  Under the first inquiry, a claim may be collateral if it does not require the court to "immerse itself" in the substance of the underlying Medicare claim or demand a "factual determination" as to the application of the Medicare Act.  *Id.* (citing *Affiliated Prof'l*, 164 F.3d at 285–86).  The claim also cannot seek relief that would be "'administrative,' i.e., the substantive, permanent relief that the plaintiff seeks or should seek through the agency appeals process."  *Id*.  Rather, "the claim must seek some form of relief that would be unavailable through the administrative process."  *Id*.

The procedural due process and *ultra vires* claims asserted by Supreme in this case mimic the claims in *Family Rehab*, that the Fifth Circuit found to be collateral.  In *Family Rehab*, the Fifth Circuit observed that like the *Eldridge* case, Family Rehab only requested a hearing before the government initiated recoupment of medicare revenues.  *Family Rehab*, 886 F.3d at 503.  In turn, Supreme, like the plaintiff in *Family Rehab*, does not seek a determination that the recoupment is wrongful under the Medicare Act.  Accordingly, the court will not have to wade into the Medicare Act or its regulations.  Instead, Supreme seeks only a temporary suspension of recoupment  until after it has had a hearing before an ALJ.  *Id*.  Given the similarity  between this suit and the *Family Rehab* case, the court necessarily finds that Supreme's procedural due process and *ultra vires* claims are collateral to the outcome of the agency proceedings.  *Family Rehab, supra*; *Sahara Health Care, Inc. v. Azar*, 349 F. Supp.3d

11

555, 565 (S.D. Tex.2018).[7]

In *Family Rehab*, the Fifth Circuit further found that plaintiff "raised at least a colorable claim" that erroneous recoupment would "damage [it] in a way not recompensable through retroactive payments." *Family Rehab, supra* (quoting *Eldridge*, 424 U.S. at 331, 96 S.Ct. 893). In so finding, the court noted that plaintiff alleged that if recoupment continued before it obtained an ALJ hearing, then it would go out of business, which also would adversely affect employees and patients. *Id*. The combined threats of going out of business and disruption to Medicare patients sufficed to establish irreparable injury – at least at the pleading stage. *Id*.

The allegations in Supreme's complaint are akin to those in *Family Rehab*.

Furthermore, in *Family Rehab*, as here, the government argued that plaintiff would not face irreparable injury if it either escalated its claim to the Appeals Council or sought a repayment plan. *Family Rehab*, 886 F.3d at 504, n16. The court discounted the availability of those avenues of relief because of the infeasibility of a viable payment plan and because of the inherent delays in escalating the claim to the Appeals Council. *Id*.

Supreme, in contrast, *did* enter into a 60 month re-payment plan with the government. Moreover, in October 2016, Supreme proposed a repayment schedule that contemplated monthly payments of $25,500 for 17 months, then $40,000 for 12 months, followed by $76,000 for 12 months, and finally $100,000 for eleven months. (Oct. 4, 2016, Letter from E. Winston to

---

[7] However, the court does not have jurisdiction to consider Supreme's substantive due process claim. Supreme alleged that defendants abused their discretion when they arbitrarily and capriciously decided to withhold their Medicare payments to recoup prior overpayments. (Compl., ¶¶ 85-87). This claim is not "collateral" because it embroils the court in the merits of the Secretary's decision to begin recoupment. *D&G Holdings, LLC v. Sylvia Mathews Burwell*, 156 F. Supp.3d 798, 815 (W.D. La.2016) (citations omitted).

Palmetto; Gov.t. Opp. to TRO/Prel. Inj., Exh. C., pg. 42).  The repayment plan proffered by Supreme was at least, if not more, onerous than the one that the government enacted in January 2018.  *See* Gov.'t Exh. D, [doc. # 27-4].  Moreover, since 2015, Supreme has received over $3 million in medicare payments, and has managed to weather over $825,000 in recoupment charges.  *See* Strickland Declaration.  Although Supreme's recoupment schedule is poised to increase in the coming years, it is anticipated to max out at a rate lower than what Supreme represented it could handle in 2016.  There is no indication that there has been a material change in Supreme's circumstances.

Furthermore, in *Family Rehab*, the delays for escalation had not lapsed – either when plaintiff filed suit or even by the time the Fifth Circuit issued its decision.[8]  Supreme, however, requested ALJ review on July 10, 2015, i.e., almost four years ago.  If the effects of recoupment were as dire as now alleged, Supreme could have "escalated" the administrative process and proceeded to judicial review on the merits of its claim long before now.  In short, escalation was/is a viable, alternative path to review of the recoupment decision in this case.[9]

It also bears repeating that it is approaching four years since Supreme requested ALJ

---

[8]  The earliest that administrative remedies can be exhausted via escalation is 270 days from the request for an ALJ hearing.  *See Family Rehab*, 886 F.3d at 501.

[9]  Some courts have discounted the effectiveness of the escalation route because it requires the provider to forego its right to a hearing, to present testimony, and to cross-examine witnesses.  *See e.g., Med-Cert Home Care, LLC v. Azar*, No. 18-2372, 2019 WL 426465, at *8 (N.D. Tex. Feb. 4, 2019).  Also, the review before the ALJ is de novo.  On the other hand, the provider already should have presented all of the pertinent written evidence at the redetermination and reconsideration levels.  Moreover, while judicial review is deferential to the decision below, if an error was made at the reconsideration level, it may inure to the benefit of the claimant to appeal *that* decision to the district court because it may not be as well-reasoned, explained, or supported as a decision issued by an ALJ or the Appeals Council.

review.  Therefore, according to the complaint which alleged a three to five year delay in having claims heard by an ALJ, Supreme is due to have its ALJ hearing within the next 16 months. Having waited this long already, there is no indication that Supreme cannot hold out a while longer.

Supreme further asserted that if recoupment continued and it went out of business, then its employees would be made redundant and patients would be left without care.  The evidence, however, demonstrates that Supreme does not appear to be in imminent danger of closing shop. *See* discussion, *supra*.  Moreover, even if it was, Supreme admitted that there were other capable home health agencies in the area via its October 2016 correspondence to Palmetto wherein Supreme represented that health insurance companies were consolidating their operations with these other providers.  *See* Oct. 5, 2016, Letter from E. Winston to Palmetto; Gov't. Opp. to TRO/Prel. Inj., Exh. C., pg. 47.  In addition, Supreme's employees should be able to find employment with these other home health agencies, especially insofar as the additional provision of services to Supreme's (former) patients then would overburden the capacity of the other agencies.

In sum, consideration of the existing record evidence propels the finding that Supreme would *not* be damaged in a way that could not be remedied by a postdeprivation hearing. Nonetheless, in *Family Rehab*, the Fifth Circuit stressed that at the pleading stage, plaintiff need only allege a colorable claim of non-redressable damage.  *See Family Rehab*, 886 F.3d at 504 n.15.  If so limited to the allegations of the complaint, the court is constrained to find that Supreme satisfied the requirements for the *Eldridge* collateral claim exception to the administrative exhaustion requirement for purposes of its procedural due process and *ultra vires*

14

claims. *See Family Rehab, supra*. Instead, the court will apply the foregoing evidence regarding the alleged precariousness and exigency of Supreme's situation to its claims on the merits. *See* discussion, *infra*.

      b)      <u>Preclusion of Judicial Review Exception under 28 U.S.C. § 1331</u>

In *Shalala v. Illinois Council on Long Term Care, Inc*, the Supreme Court recognized that a court may exercise jurisdiction over medicare claims under 28 U.S.C. § 1331 if administrative obstacles "would not simply channel review through [HHS,] but would mean no review at all." *Adams, supra* (quoting *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 15, 120 S.Ct. 1084, 1094 (2000)). This exception, however, is "narrow and applies only when channeling a claim through the agency would result in the complete preclusion of judicial review." *Family Rehab, supra* (citations and internal quotation marks omitted).

In *Family Rehab*, however, the Fifth Circuit found that delayed judicial review and resulting prejudice stemming from the "colossal backlog in Medicare appeals" did not suffice to confer jurisdiction under § 1331. *Id*. Likewise, here, Supreme did not allege that channeling will render judicial review completely unavailable. Therefore, § 1331 does not confer jurisdiction. *See Adams, supra*.

      c)      <u>Mandamus Jurisdiction</u>

Under the Mandamus and Venue Act, 28 U.S.C. § 1361, the district courts have "jurisdiction [over] any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Furthermore, the Fifth Circuit has held that "§ 405(h) does not preclude § 1361 jurisdiction to review otherwise unreviewable procedural issues." *Randall D. Wolcott, M.D.,*

15

*P.A. v. Sebelius*, 635 F.3d 757, 766 (5th Cir.2011).  Mandamus jurisdiction, however, is limited to requests that the "court order the defendant to complete affirmative actions," and does not extend jurisdiction to requests for injunctive relief.  *Family Rehab, supra* (citation omitted).

In this case, however, as in *Family Rehab*, Supreme seeks an "injunction prohibiting Defendants from recouping from Plaintiffs' Medicare payments . . ." rather than compelling defendants to perform a preexisting duty.  *See Family Rehab., supra*.  Consequently, plaintiff is not seeking mandamus relief, and § 1361 does not confer jurisdiction.

d)    <u>The All Writs Act and the Administrative Procedure Act</u>

It is manifest that the All Writs Act, 28 U.S.C. § 1651, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501, et seq., do not independently create or provide jurisdiction.  *Faith Home*, 166 F.3d at 341.  Furthermore, a "final agency action," is required for subject matter jurisdiction under the APA.  *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir.1994); *Gallo v. Mathews*, 538 F.2d 1148, 1151 (5th Cir.1976).

Here, of course, there is no final agency action, and thus no basis to support a claim under the APA.  *See* discussion, *supra*.  Also, "the APA does not provide a mechanism to override § 405(h)'s jurisdictional requirements and does not authorize district courts subject matter jurisdiction to issue Medicare suit injunctions."  *Sahara*, 349 F. Supp.3d at 565 (citations omitted).

## II.    **Failure to State a Claim/Summary Judgment**

If evidence outside of the pleadings is presented to the court and used in deciding a Rule 12(b)(6) motion, then the court must convert the matter to a motion for summary judgment. Fed.R.Civ.P. 12(d); *Knighton v. Merscorp Inc.*, 304 Fed. Appx. 285, 287 (5th Cir. 2008) (citing

16

*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 283 (5th Cir.1993)).  In the matter *sub judice*, the government submitted evidence, including a declaration, in its response to plaintiffs' motion for TRO and preliminary injunction.  *See* doc. # 27.  The court has considered this evidence for purposes of the pending motions, and therefore, is obliged to convert the Rule 12(b) motion into a motion for summary judgment.  Fed.R.Civ.P. 12(d).

In the event of conversion, Rule 12(d) requires that all parties be afforded a reasonable opportunity to present all material pertinent to a motion for summary judgment.  *Id.* Specifically, the notice and hearing requirements of Rules 12(b) and 56(c) of the Federal Rules of Civil Procedure must be adhered to.  *Mackey v. Owens*, 1999 WL 423077 (5th Cir. June 2, 1999) (unpubl.).

The court, however, need not give a party "express notice" that a motion to dismiss will be treated as a motion for summary judgment:

> given [Rule 12(d)]'s express declaration that a motion to dismiss shall be treated as a motion for summary judgment where matters outside the pleadings are presented to and not excluded by the court, the simple act of placing matters outside the pleadings before the court provides adequate notice that a motion to dismiss may be converted into a motion for summary judgment.

*Mackey, supra* (internal citation omitted).

Here, plaintiff had notice that the motion to dismiss could be treated as a motion for summary judgment, given the presence of the extrinsic evidence in the court record.  *See Hager v. NationsBank N.A.*, 167 F.3d 245, 247 n.1 (5th Cir.1999) (plaintiff received notice that the court could view defendant's motion as one for summary judgment when defendant filed its motion with an attached affidavit, and the district court did not rule on the motion for over two months).  Regardless, the court always possesses the inherent authority to dismiss an action *sua sponte*, without motion by a defendant.  *McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988)

(citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)); *see also Spann v. Woods*, 66 F.3d 322, 1995 WL 534901, at *2 (5th Cir. 1995) (unpubl.). Furthermore, a report and recommendation, itself, provides sufficient notice to the parties. *McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (citing *Magourik v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998)).

a)   <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Little, supra* (citation omitted) (emphasis in original). In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

When a movant bears the burden of proof on an issue, it must establish "beyond [doubt]

all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

> b)      Procedural Due Process Claim

The complaint alleges that

> [t]o satisfy the requirements of due process, the HHS Secretary is statutorily required to provide a home health agency with an administrative hearing and an opportunity to challenge the overpayment determinations before a fair and impartial decision maker prior to imposing a self-help recoupment remedy that would force Plaintiffs out of business, a least where, as here, the home health agency has demonstrated significant reason to doubt the validity of the alleged overpayment determinations underlying the threatened recoupment . . .

> Defendants are threatening to deprive Plaintiffs of their property and liberty interests in or associated with its Medicare payments and home health business and goodwill without due process of law, in violation of the Fifth Amendment of the United States Constitution and other applicable law. Such action threatens to cause irreparable harm to Plaintiffs. The issuance of injunctive relief prohibiting such recoupment until such due process has been had will not harm Defendants and is in the public interest.

(Compl., ¶¶ 83-84).

Defendants argue that Supreme does not have a constitutionally or statutorily protected right to a pre-recoupment hearing.[10] The undersigned agrees.

The Fifth Amendment to the U.S. Constitution provides, in pertinent part, that no person shall be deprived of life, liberty, or property, without due process of law. U.S. CONST. AMEND. V. At minimum, the Due Process Clause requires that "deprivation of life, liberty or property by

---

[10] In fact, Congress provided for recoupment to begin on the date that the QIC issues an unfavorable decision, which is *before* an ALJ hearing would be completed – even in the absence of an agency backlog. *Infinity Healthcare, supra* (citing 42 U.S.C. § 1395ddd(f)(2)(A)).

adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153 (1982) (quoted source omitted).  The Supreme Court regularly has held that "some form of hearing is required before an individual is *finally* deprived of a property interest."  *Eldridge, supra* (citations omitted) (emphasis added).  Further, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id*.  (citations and internal quotation marks omitted).

The due process inquiry is comprised of two parts:  was plaintiff deprived of a protected interest, and if so, what process was due.  *Logan, supra*.  As to the first question, it is well established that

> [a] property interest requires more than a unilateral expectation of a benefit. Instead, a person must have a legitimate claim of entitlement to it.  Property interests are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Pers. Care Products, Inc. v. Hawkins*, 635 F.3d 155, 158 (5th Cir.2011) (citations and internal quotation marks omitted).

The courts are split as to whether providers such as Supreme have a protected property interest in Medicare payments in the present context.  Following remand from the Fifth Circuit, the district court in *Family Rehab* determined, without discussion, that Family Rehab had a "property interest in receiving payments owed to it for services rendered."  *Family Rehab., Inc. v. Azar*, No. 17-3008, 2018 WL 3155911, at *4 (N.D. Tex. June 28, 2018); *see also Adams*, 2018 WL 5264244, at *10 (provider has property interest in receiving and retaining the Medicare payments it has earned); *Infinity Healthcare Servs., Inc. v. Azar*, 349 F. Supp.3d 587, 596 (S.D. Tex.2018) ("Plaintiff has a property interest in the Medicare payments for services rendered.").

21

Moreover, in *Med-Cert Home Care, LLC v. Azar*, the court cited *Family Rehab* and *Adams* as "precedent," and concluded that the provider in its case was not claiming a property interest in the alleged overpayments, but instead had "an interest in the Medicare payments for properly billed claims that [were] now being recouped by the government." *Med-Cert Home Care, LLC v. Azar*, No. 18-2372, 2019 WL 426465, at *6 (N.D. Tex. Feb. 4, 2019).

On the other hand, the court in *Sahara Health Care, Inc. v. Azar*, conducted a more reasoned analysis of the property interest issue and determined that a provider's participation in the Medicare program did not confer it with a property interest in its reimbursement claims. *Sahara Health Care, Inc. v. Azar*, 349 F. Supp.3d 555, 572 (S.D. Tex.2018) ("*Sahara*").[11]  In so holding, the court relied on the following language by the Fifth Circuit:

> [t]he United States has assumed no blanket responsibility to compensate physicians or hospitals for services they render to patients.  Instead, the government has assumed the obligation to compensate providers of the medical service to the extent those services are covered by the Act . . . a provider has no reasonable expectation or entitlement to be paid on a bad claim, that is a claim not covered under the Act.

*Sahara*, 349 F. Supp.3d at 571 (quoting *Smith v. N. Louisiana Med. Review Ass'n*, 735 F.2d 168, 173 (5th Cir. 1984).

*Sahara* also relied on *Personal Care Products, Inc. v. Hawkins* where, in the analogous Medicaid context, the Fifth Circuit essentially determined that a provider did not have a property interest in the withholding of *present* reimbursement claims while *past* claims were under investigation for fraud – provided  the withholding was authorized by statute.  *Sahara, supra* (citing *Personal Care Products*, 635 F.3d at 159).  Here, not only is recoupment and offset authorized by regulation, *see e.g.*, 42 C.F.R. §§ 405.371, 405.373, and 401.607, Supreme also

---

[11]  The decision is currently on appeal to the Fifth Circuit.  *See Sahara Health Care, Inc. v. Alex Azar, II*, No. 18-41120 (5th Cir.).

expressly requested and consented to an extended repayment schedule ("ERS"), wherein it agreed that the "loan installments" would be withheld from Supreme's claims payments. *See* Oct. 4, 2016, Letter from E. Winston to Palmetto; Gov.t. Opp. to TRO/Prel. Inj., Exh. C., pg. 42 and Gov.'t Exh. D, [doc. # 27-4]. This is consistent with Supreme's longstanding acknowledgment as a participant in the Medicare program that Medicare was permitted to recoup any overpayments via the withholding of future payments. *See* discussion, *supra*.

It is also worth noting that the overpayment and interest assessed by the Medicare contractor were due by July 1, 2016. [doc. # 1-6 at pgs. 1-2]. Supreme could have paid the debt in full at that time and avoided recoupment entirely.[12] It appears anomalous that by electing to postpone the obligation to pay the debt in full when due, and instead voluntarily entering into an ERS with CMS, that a provider, like Supreme, should be deemed to have conferred upon itself a protected property interest secured by the installments which are automatically recouped from current payments. Accordingly, the undersigned must part company with the courts that have found a protected property interest derived from the Medicare payments related to properly billed claims used to recoup prior overpayments. *See Med-Cert Home Care, supra.*

Instead, the undersigned is obliged to rely on the limited guidance to be extracted from analogous Fifth Circuit decisions,[13] and join the courts which have determined that a provider

---

[12] Supreme was aware of the potential overcharge since at least 2012. During the intervening four year period, it stands to reason that a prudent provider either would have set aside funds for this looming contingency, or otherwise taken steps to improve its balance sheet for purposes of securing a private long term loan at a rate more favorable than the ten percent charged by the government.

[13] In a per curiam decision on a petition for a writ of mandamus to another division of this court, the Fifth Circuit wryly remarked that a provider's suit to cease medicare recoupment until an oral hearing occurred did not "implicate a property interest of the highest order." *In Re:*

does not have a protected property interest in Medicare overpayments.  *See Sahara, supra*;

*Greater Dallas Home Care All. v. United States*, 10 F. Supp.2d 638, 646 (N.D. Tex.1998).  As a

result, Supreme does not enjoy a viable due process claim.[14]  However, because reasonable

jurists may disagree regarding the existence of a property interest in this situation, *see*

discussion, *supra*, the court will proceed with the remainder of the due process analysis.

"Once it is determined that due process applies, the question remains what process is

due." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240, 108 S.Ct. 1780, 1787 (1988).  Due

process, however, is pliable and depends on the situation.  *Eldridge, supra* (citation omitted).

Identifying the contours of due process requires consideration of three factors:

> [f]irst, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail.

*Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

In *Eldridge*, the sole interest at stake was the plaintiff's uninterrupted receipt of disability

payments pending final administrative decision on the Commissioner's determination that the

claimant no longer was disabled.  *Eldridge, supra*.  The Court remarked that only in *Goldberg v.*

*Kelly*, 397 U.S. 254, 90 S.Ct. 1011 (1970), a case involving welfare assistance to persons on the

---

*D&G Holdings, L.L.C.*, No. 16-30024 (5th Cir. Jan. 22, 2016).  The court added that Medicare
was not seeking to take any property from the provider – it simply refused to disburse additional
funds until the provider's debt was repaid.  *Id*.  Thus construed, the undersigned is not persuaded
that Supreme enjoys a protected property interest.

[14]  Even if Supreme has a property interest, Winston does not.  The Fifth Circuit has
declined to recognize a protected property interest in favor of a third-party stemming from an
agreement between the United States and another entity.  *See McCasland v. City of Castroville*,
514 Fed. Appx. 446, 449 (5th Cir.2013).

margins of subsistence, had it ever required an evidentiary hearing prior to a temporary deprivation. *Id*. The Court in *Eldridge* distinguished *Goldberg* on the basis that disability benefits, unlike welfare, were not based on financial need. *Id*. In *Eldridge*, the Court also emphasized that "the possible length of wrongful deprivation of . . . benefits (also) is an important factor in assessing the impact of official action on the private interests." *Eldridge*, 424 U.S. at 341, 96 S.Ct. at 906 (citation omitted). In that case, the delay between the cutoff of benefits and a final decision after hearing was greater than one year. *Id*.

Supreme, however, is not an individual on the margins of existence, it is a corporation. Moreover, as it awaits its administrative hearing regarding the overpayment determinations, Supreme continues to receive significant funds not only from Medicare, but also from Medicaid and private sources. *See* Statement of Cash Flow; Gov't Opp. Memo., Exh. E [doc. # 27-5]. Further, the undersigned already has discounted the impact of Supreme's purported insolvency on patients and employees. *See* discussion, *supra*. In addition, at least at this point, Supreme's anticipated remaining wait time for an ALJ hearing is one to two years[15] – not that different from the delay ultimately found unactionable in *Eldridge*.

The second *Eldridge* factor focuses upon the procedures provided and the possibility of error. *Infinity Healthcare, supra*. Supreme already has completed two levels of the administrative process, in addition to the initial overpayment determination. *Id*. Moreover, at least one of Supreme's appeals was partially favorable, with the rationale painstakingly detailed

---

[15] See the Office of Medicare Hearings and Appeals Average Processing Times: https://www.hhs.gov/about/agencies/omha/about/current-workload/average-processing-time-by-fiscal-year/index.html (last visited on April 3, 2019). The court may take judicial notice of government websites. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir.2005).

in an exhaustive 130 page decision.  (Recon. Decision; Gov.'t Opp. Memo., Exh. B [doc. # 27-2]).  While Supreme asserted in its complaint that historically there was a high reversal rate at the ALJ level, data from more recent years show that appeals are favorable only 16-18 percent of the time.[16]  Also, the evidence used to determine the overpayments in this case was documentary and consisted of records produced by plaintiff.  *See Infinity Healthcare, supra*.  Further, Supreme had the opportunity to submit additional evidence and arguments at the redetermination and reconsideration levels.  *Id*.  In fact, as the court in *Infinity Healthcare* aptly noted, there is no indication why a "live evidentiary hearing is necessary or helpful to present documentary evidence proving that the services for which [plaintiff] billed and collected payments from Medicare are in fact supported by the documentation required by Medicare."  *Infinity Healthcare, supra*.  In short, Supreme has not established that the procedures to which it already availed itself present the kind of risk of an erroneous deprivation such that additional procedural safeguards are needed to prevent a constitutional due process violation.  *Id*.

Juxtaposed against plaintiff's interests, the third *Eldridge* factor focuses upon "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the termination of . . . [payments]."  *Eldridge, supra*.  The Fifth Circuit has noted that in June 2017, the HHS Secretary reported that there were over 600,000 pending appeals, with the number expected to increase.  *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 344 (5th Cir.2017).  Therefore, to dispose of this backlog and to decide ALJ cases within 90 days, the government

---

[16] *See* Decision Statistics, https://www.hhs.gov/about/agencies/omha/about/current-workload/decision-statistics/index.html (last visited on April 3, 2019).

26

would need to hire a veritable army of ALJs and their attendant support staff. *Infinity Healthcare, supra.* Meanwhile, "the costs of making continued payments for an additional three to five years to hundreds of thousands of providers that have been determined by multiple independent reviews to have been overpaid, with little hope of later recovering the overpayment, would likewise be enormous." *Id.* As it is, the Medicare Trust Fund is projected to be insolvent by 2026. (Medicare Insolvency Projections, June 18, 2018; Gov.'t Opp. Memo., Exh. H [doc. # 27-8]). Moreover, according to the Government Accountability Office, HHS expended almost $90 billion in improper Medicare and Medicaid payments in fiscal year 2017.[17]

Thus, as the Court observed in *Eldridge*,

> [a]t some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited.

*Eldridge*, 424 U.S. at 348, 96 S.Ct. at 909.

In sum, the undersigned finds that, under the particular circumstances of this case, due process does not require defendants to provide plaintiff(s) with an ALJ hearing before continuing to recoup prior overpayments. *See Infinity Healthcare, supra*; *Sahara, supra*; *Blue Valley Hosp., Inc. v. Azar*, No. 18-3117, 2019 WL 1375222, at *5 (10th Cir. Mar. 27, 2019).[18]

---

[17] U.S. Gov.'t Acct. Office Rpt. to Congr. Add.: IMPROPER PAYMENTS Actions and Guidance Could Help Address Issues and Inconsistencies in Estimation Processes; https://www.gao.gov/assets/700/692207.pdf (Last visited on April 4, 2019).

[18] In *In Re: D&G Holdings, L.L.C.*, the Fifth Circuit opined that petitioner's claim for cessation of recoupment until an oral hearing occurred was "at best, questionable." *In Re: D&G Holdings, L.L.C.* Although on remand the district court granted a preliminary injunction following a hearing, the plaintiff later voluntarily dismissed the case. *See D & G Holdings L L C v. Burwell*, No. 15-2624 (W.D. La.).

c)    *Ultra Vires* Acts

Supreme alleged that defendants were required to provide it with an ALJ hearing and

decision within 90 days of its request.  (Compl., ¶ 89) (citing 42 U.S.C. § 1395ff(d)(1)(A); 42

C.F.R. § 405.1016(a)).  Because defendants failed to meet the deadline, Supreme seeks an order

enjoining defendants from recouping Medicare payments during the delay.  (Compl., ¶ 90).

"In the agency context, an *ultra vires* act is one where the agency has exceeded its

statutory or constitutional power to act." *D&G Holdings, LLC v. Sylvia Mathews Burwell*, 156

F. Supp. 3d 798, 816 (W.D. La.2016) (citations omitted).  However, in a subsection entitled

"[c]onsequences of failure to meet deadlines," Congress provided an express remedy:

> [i]n the case of a failure by an administrative law judge to render a decision by the end of the period described in paragraph (1), the party requesting the hearing may request a review by the Departmental Appeals Board of the Department of Health and Human Services, notwithstanding any requirements for a hearing for purposes of the party's right to such a review.

42 U.S.C. § 1395ff(d)(3).

In other words – escalation.  If the agency fails to provide timely ALJ review, then

administrative exhaustion is excused, and the provider may proceed more quickly to federal

court.  The foregoing statutory remedy – to which plaintiff acceded to when it applied to be a

Medicare provider – fully complies with constitutional due process.  *See* discussion, *supra*.

Accordingly, defendants did not commit any *ultra vires* acts.[19]

The court finds that there is no genuine dispute as to any material fact, and that

defendants are entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.

---

[19]  In any event, federal officers who engage in *ultra vires* conduct are subject to liability for damages in their individual capacities.  *Navy, Marshall & Gordon, P.C. v. U.S. Int'l Dev.-Cooperation Agency*, 557 F.Supp. 484, 488–89 (D.D.C.1983) (citations omitted).  Here, however, Supreme sued Azar and Verma for *injunctive* relief, only in their *official* capacities.

**Conclusion**

The court is not unsympathetic to the situation that Supreme and other providers in the Medicare program find themselves.  However, the present difficulty was created, at least in part, by the legislation and related policy decisions.  Congress is aware of the present plight of Medicare providers and could take steps to redress the situation, either via additional funding for more ALJs, by postponing recoupment as advocated for here, or by other means.  While some courts have stepped into the vacuum and utilized their authority under the Constitution to craft a solution, the undersigned is hesitant to usurp the role of the legislature, especially under the circumstances of this case.

Accordingly,

IT IS RECOMMENDED that the motion to dismiss for lack of subject matter jurisdiction [doc. # 26] filed by defendants, Alex Azar, II and Seema Verma, be GRANTED-IN-PART, as to each plaintiff, as follows:

    1)    that Supreme Health Services, Inc.'s claims for violations of
          substantive due process and preservation of rights under § 704 of
          the APA be DISMISSED, WITHOUT PREJUDICE, as to all
          parties in the case; and

    2)    that Emily Winston's claims be DISMISSED, WITHOUT
          PREJUDICE, in their entirety.
Fed.R.Civ.P. 12(b)(1).

IT IS FURTHER RECOMMENDED that the motion to dismiss for failure to state a claim upon which relief can be granted [doc. # 26] filed by defendants, Alex Azar, II and Seema Verma, be converted into a motion for summary judgment, and that the motion be GRANTED-IN-PART, DISMISSING, WITH PREJUDICE, Supreme's procedural due process and ultra vires claims, as to all parties in the case.  Fed.R.Civ.P. 56.

IT IS FURTHER RECOMMENDED that Azar and Verma's motion to dismiss [doc. # 26] otherwise be DENIED.

IT IS FURTHER RECOMMENDED that the motion to dismiss [doc. # 28] filed by Palmetto GBA, L.L.C., be DENIED, as moot.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 8th day of April 2019.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE